UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : NO. 3:22-CR-25 |
| v. | : (JUDGE MANNION) |
| VICTOR BARRERA, JR., | : |
| Defendant. | : |

### MEMORANDUM

Pending before the court is defendant, Victor Barrera's, motion to suppress evidence pursuant to Fed. R. Crim. P. 12(b). (Doc. 28). Barrera is charged with Possession with Intent to Distribute Fentanyl and Cocaine in violation of 21 U.S.C. §841(a)(1). The present case arises from a motor vehicle stop initiated by Pennsylvania State Police ("PSP") Trooper Lorenzo Policichio ("Policichio") on June 21, 2021. Barrera seeks to suppress the items found after Policichio searched his vehicle. An evidentiary hearing was held on February 22, 2023. The matter is fully briefed and is now ripe for disposition.

### I. BACKGROUND

On June 6, 2021, PSP Trooper Policichio initiated a traffic stop on Interstate 80 in Butler Township, Luzerne County. Policichio observed a late

model silver GMC pickup truck with an Arizona license plate change lanes without leaving the proper distance and the vehicle having excessive window tint.

After the vehicle pulled over, Policichio approached the passenger side window of the GMC and spoke with the driver, Victor Barrera, Jr. Policichio advised Barrera of his traffic violations and informed Barrera that he would consider issuing him a written warning dependent upon his license being valid and there being no outstanding warrants.[1] Barrera provided Policichio with his driver's license, which indicated he resided in Douglas, Arizona. The government claims that Barrera appeared to have a heightened and sustained level of nervousness throughout the entire encounter.[2] Additionally, Policichio observed a strong scent emanating from air fresheners contained within Barrera's vehicle. Policichio then asked Barrera about his travel plans and Barrera indicated that he was in New York City on vacation partying by himself for a few days. Policichio also asked Barrera where he was traveling from. Barrera stated that he was traveling from

---

[1] Policichio's patrol vehicle was equipped with an audio and visual recording system. Policichio's microphone was not fully charged and consequently resulted in there being no audio from the encounter.
[2] Contrary to the Government's assertions, the court's observations of the video fails to reveal or display any apparent or unusual nervousness by the defendant.

Minnesota where he was installing solar panels. After these initial questions, Policichio returned to his patrol vehicle to query Barrera's information.

The query of Barrera's information indicated that Barrera had a prior felony marijuana trafficking conviction and that Douglas, Arizona was located near the border of the United States and Mexico. Policichio then exited the vehicle and reengaged Barrera at his passenger side window. Having checked the validity of his documents and finding no outstanding warrants, Policichio informed Barrera that he would be receiving a warning for the traffic violations, hence the "Rodriquez" moment. Unnecessarily, Policichio directed Barrera to get out of his vehicle and follow him back to the patrol vehicle where he began a series of questions. Although there was no evidence of weapons present, once Barrera exited his vehicle, he was patted down for officer safety.

At the side of the patrol vehicle, Policichio questioned Barrera about his criminal history. Barrera explained he was previously arrested for possession of marijuana. Policichio then asked Barrera about his time vacationing. Barrera explained that he had taken two weeks off of which he spent four days in New York City. Policichio asked Barrera why he did not go to visit his family. Barrera explained that it would take too much time to drive from Minnesota to Arizona and back again. Barrera also explained prior

to his time in New York City, he spent time in Chicago, Illinois. Policichio then asked Barrera about the nature of his work. Barrera explained that he traveled around installing fencing around solar panel farms. Policichio then asked Barrera if his vehicle was a work vehicle to which Barrera responded by stating it was his personal vehicle.

Policichio proceeded to ask Barrera for permission to search his vehicle. Barrera granted consent verbally and in writing. During the search, over 2.1 grams of fentanyl and over 50 grams of cocaine were located inside Barrera's vehicle.

On January 25, 2022, a grand jury in the Middle District of Pennsylvania returned an indictment against Barrera charging one count of possession with intent to distribute fentanyl and cocaine, in violation of Title 21 U.S.C. §841.

## II. STANDARD OF REVIEW

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. Lange v. California, 141 S.Ct. 2011, 2017 (2021).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753-55, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Generally, a search "requires a warrant supported by probable cause." Carpenter v. United States, 138 S.Ct. 2206, 2213 (2018) (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)). "Probable cause exists when there is

a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991) (internal quotations omitted). An affidavit in support of a search warrant "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists." United States v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996).

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88, (1998). "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." U.S. v. Ellis, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "Under Katz, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy." Id. (citations omitted).

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" United States v. Lara-Mejia, 482 F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting United States v. Calandra, 414 U.S. 338, 347 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" Id. "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" Id. (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." Id. (citation omitted). Stated otherwise, where the search or seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred and that it was supported by reasonable suspicion." U.S. v. Lowe, 791 F.3d 424, 432 n. 4 (3d Cir. 2015). That is, the government then must show that the

warrantless search falls within "certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011).

### III. DISCUSSION

This court has jurisdiction over defendant's motions to suppress evidence under 18 U.S.C. §3231. A criminal defendant brings a pre-trial motion to suppress evidence under Fed.R.Crim.P. 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015).

Recently, in United States v. Hurtt, 31 F.4th 152, 158-59 (3d Cir. 2022), the Third Circuit explained:

> A traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Such a seizure does not violate the Fourth Amendment, however, if it is reasonable. A police officer's decision to stop a vehicle is reasonable if he or she "ha[s] probable cause to believe that a traffic violation has occurred." Any subsequent investigation "must be 'reasonably related in scope to the reasons for the stop.'" Even if an officer lawfully stops a suspect at first, "it could become 'unreasonable,' and thus violate the Constitution's proscription [against unreasonable searches and seizures], at some later time." If an extension of a stop prolongs it "beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," the resulting delay must be supported by reasonable suspicion. When reviewing an allegation that a traffic stop started out properly but later was improperly extended, we "look[] to the facts and circumstances confronting [the officer] to determine whether his or her actions during the stop were reasonable."

> In Rodriguez v. United States, the Supreme Court established a test for judging the lawfulness of an extension of a traffic stop. There, the Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Thus, "a seizure justified only by a police-observed traffic violation, ... 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission.'"

(internal citations omitted). The Court in Hurtt, then explained that "[a]n unreasonable extension [of a traffic stop] occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." 31 F.4th at 159 (citation omitted). At this point, the court must conduct a two-stage inquiry: 1) "determine [if and] when the stop was 'measurably extend[ed]'"; and 2) "[a]fter determining when the stop was extended—the 'Rodriguez moment,' [] —[the court] [must] assess whether the facts available ... at that time were sufficient to establish reasonable suspicion." Id. (citation omitted). Further, "[a]fter the Rodriguez moment, the court cannot consider anything "later in the stop [to] inform [its] reasonable suspicion analysis." Id. (citation omitted). Thus, the court "ask[s] whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality," and "[a]ny break in that mission taints the stop because it is the result of an unreasonable delay." Id. (citation omitted).

Additionally, "'unrelated inquiries' resulting in even a *de minimis* extension [of a traffic stop] are unlawful if not supported by reasonable suspicion," and "[d]etermining the 'relatedness' of any given action to the basic mission of investigating a traffic violation requires assessing whether the action was something ordinarily incident to a traffic stop. Id. at 160 (internal citations omitted). Actions normally related to the mission of a traffic stop, include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. 160 (internal citations omitted). Further, when conducting on-mission tasks, "[o]fficers should be reasonably diligent," and "the best indication of whether an officer has been reasonably diligent is by noting what the officer actually did and how he [or she] did it." Id. at 160 (internal quotations and citation omitted).

In viewing all of the facts and circumstances confronting the trooper in this case, the court finds that the investigation into the traffic violations was lawful. However, once Policichio reengaged Barrera and asks Barrera to leave his car and follow him to the patrol vehicle, allegedly for purposes of preparing the warning, the Rodriguez moment occurs. After asking Barrera to leave his vehicle, the trooper's actions deviated to an off-mission task of beginning a drug trafficking investigation. At this point, the stop became

unlawful and unreasonably prolonged beyond the time required to complete the mission of the traffic stop, i.e., to issue the warning.

At this point, Barrera was told he was going to receive a warning. Policichio directed him to exit the vehicle and accompany him back to the passenger side of the patrol vehicle to obtain additional information before issuing the warning.

After Barrera exited his vehicle, Policichio requested to pat him down in order to make sure he did not have any weapons. A pat down was conducted and Barrera then follows him to the passenger side window of the patrol vehicle. After identifying the Rodriguez moment, the court must then review the totality of the circumstances presented to the trooper and determine if officer had "a reasonable, articulable suspicion of criminal activity." United States v. Robinson, 529 Fed. Appx. 134, 137 (3d Cir. 2013)

The government presents the following indicators prior to the Rodriguez moment: heavy sun screening, two air fresheners, driving on a "super drug corridor," a license plate from a border state, an "elevated and sustained level of nervousness," travel from a source city (New York City), and Barrera's two answers indicating he was having a blast partying by himself and that he just started in the solar industry. After returning to his patrol vehicle, Policichio checked for outstanding warrants and reviewed

Barrera's criminal history. The queries revealed that Barrera was from Douglas, Arizona, a border city, and that Barrera had a prior federal drug importation case. In the totality of the circumstances, reasonable suspicion did not exist.

The government takes the approach of citing supportive authority for each indicator they identify. However, a closer examination of each of these cases reveals additional indicators that tipped the scale towards an objective reasonable officer having reasonable suspicion. In <u>United States v. Garner</u>, 961 F.3d 264, 271-72 (3d Cir. 2020), the court identified air fresheners on every air vent, the defendant being extremely nervous, driving on a super drug corridor, and driving from a source city, but the Third Circuit noted additional items not present here, such as, the vehicle being a rental car with an expired rental agreement and the usual bar codes on the rental vehicle were missing or peeled away. In <u>Robinson</u>, the Third Circuit explained that the defendant was driving on a major drug corridor, his vehicle contained air fresheners, he had an unusual explanation of his travel plans, his criminal history contained issues with the DEA, but the court also noted the unusual manner in which driver stopped his vehicle, he had multiple cell phones on the vehicle's console, there were discrepancies between the state in which the defendant's license was issued and the state in which the vehicle was

registered, the vehicle was owned by a third-party, and the defendant denied his criminal history. 529 Fed. Appx. at 138. In United States v. Johnson, 452 Fed. Appx. 219, 226 (3d Cir. 2011), the Third Circuit explained that the defendant appeared nervous, was excessively sweating, and was stuttering when speaking to the officer, but, contrary to the indicators here, the court noted that the officer knew the defendant, knew of the defendant's prior involvement with individuals that trafficked narcotics, and that there was an open box of small plastic sandwich bags on the passenger seat commonly used in drug sales.

Then, turning to other district courts that the government cites, in United States v. Meran, No. CR 16-222, 2017 WL 4803927, at *9 (W.D. Pa. Oct. 23, 2017) the court noted the defendant's vehicle had heavy sun screening, he was traveling on a major drug corridor, the defendant had a New York driver's license while the vehicle was registered in Philadelphia, both cities being major source cities, there was only a single key on the keychain in the ignition, there was an energy drink in the vehicle, and the presence of air fresheners, but, differing from the items identified here, the court also noted very similar vehicles traveling on the same roadway were stopped by SHIELD officers containing hidden drug compartments and that the driver did not know the vehicle owner's last name. In United States v.

Stewart, No. 3:18-CR-00310, 2021 WL 2478440, *9-11 (M.D. Pa. June 17, 2021) the court pointed to heavy sun screening, the defendant traveling on a known drug corridor, a known source city, air fresheners, vague travel timelines, traveling well below the average flow of traffic, a California license plate obscured by a weathered frame, the driver was nervous and avoiding eye contact, but, again differing from the circumstances present here, the driver's license was from Cleveland, Ohio while driving a vehicle registered to a third-party female, the defendant distanced himself from the vehicle saying he was only using it temporarily, and the bizarre answers pertaining to defendant's relationship to the owner of the vehicle.

What can then be synthesized from these cases is that while the government utilizes indicators similarly identified in each case, the cases each contains additional factors contributing to the totality of the circumstances beyond just the simple indicator the government bases their citation upon.

While the court evaluates "whether there was an objective basis for reasonable suspicion," the court can consider the officer's "personal observations of suspicious behavior." United States v. Brown, 448 F.3d 239, 246-47 (3d Cir. 2006) (citing United States v. Nelson, 284 F.3d 472, 476 (3d

Cir. 2002). Trooper Policichio testified at the suppression hearing after being asked:

> Court: Trooper, when was it, in your experience, that you felt there was reasonable suspicion to arrest him or to search the car or to request to search the car?
> Witness: So after the conversation inside the vehicle, and he was standing outside my patrol vehicle window is – if you want to give it a percentage, *I was 75 percent there to ask for consent*. The last 25 percent came from his statements at my window. …

Hearing Tr. 109:11-21 (emphasis added). While the government places emphasis on Trooper Policichio's training and experience, it does not appear that even Trooper Policichio believed he had reasonable suspicion until *after* the Rodriguez moment.

Although factors that independently may be susceptible to innocent explanation can collectively amount to reasonable suspicion, the Supreme Court has explained that these factors must be considered with all of the circumstances presented to the officer. The court finds that the indicators the government relies upon here do not amount to an objective basis for reasonable suspicion in the totality of the circumstances prior to the Rodriguez moment.

IV.    CONCLUSION

Based on the foregoing, and in light of Hurtt, the court finds that since the controlled substances evidence "was only uncovered after the [trooper] went off-mission, the [trooper] wrongly extended the traffic stop and violated [the defendant's] Fourth Amendment right to be free from unreasonable searches and seizures." Id. at 163-64. Therefore, the court will **GRANT** the defendant's motion to suppress evidence, **(Doc. 28)**, and the controlled substances evidence found in Barrera's car will be **SURPRESSED** for trial.

An appropriate order will follow.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: May 16, 2023**
22-25-01